## UNITED STATES v. FORTY BARRELS AND TWENTY KEGS OF COCA–COLA.

(District Court, E. D. Tennessee, S. D.    April 6, 1911.)

1. **FOOD (§ 5*) — FOOD AND DRUGS ACT — CONSTRUCTION — "ADULTERATED" — "ADDED."**

Under the food and drugs act (Act June 30, 1906, c. 3915, §§ 7, 8, 34 Stat. 769, 771 [U. S. Comp. St. Supp. 1909, pp. 1190, 1191]), an article of food other than confectionery is not deemed to be adulterated merely because it contains a poisonous or deleterious ingredient unless such ingredient has been "added"; that is, unless it is foreign to the natural or normal composition of the article.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 1; Dec. Dig. § 5.*

For other definitions, see Words and Phrases, vol. 1, pp. 174, 175; 210-212.]

2. **FOOD (§ 5*) — FOOD AND DRUGS ACT — "ADULTERATED" — COCA-COLA.**

Evidence *held* to establish without contradiction that the name "Coca-Cola" is a trade-name, which has for many years been given by the manufacturer to a food product, and registered as a trade-mark; that such product is an artificial compound used in the preparation of beverages, consisting of a sweet syrup having for one of its essential ingredients caffeine, which is prescribed in definite proportions in the formula under which the compound has been manufactured for many years; that the compound, as made under such formula, has been extensively advertised, and has become well known to the trade and to consumers under such trade-mark name; and that no other article of food or beverage has been manufactured or sold under such name. *Held*, that under such facts and the provision of the food and drugs act (Act June 30, 1906, c. 3915, § 8, 34 Stat. 771 [U. S. Comp. St. Supp. 1909, p. 1191]) that mixtures or compounds known under their own distinctive names and not an imitation sold under the distinctive name of another article, if the name is accompanied by a statement of the place of manufacture, shall not be deemed adulterated or misbranded unless they contain some added poisonous or deleterious ingredient, a shipment of Coca-Cola labeled as required by such provision was not subject to condemnation as an adulterated article because of the presence of caffeine as one of its ingredients, even though such ingredient be deemed poisonous or deleterious.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 1; Dec. Dig. § 5.*]

3. **FOOD (§ 5*) — FOOD AND DRUGS ACT — "MISBRANDED."**

Nor, for like reasons, can such article, so long known and sold under its trade-name of "Coca-Cola," be deemed misbranded within the meaning of the statute because it does not contain any material element derived from the leaves of the coca plant,

[Ed. Note.—For other cases, see Food, Cent. Dig. § 1; Dec. Dig. § 5.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. Food (§ 5*) — Food and Drugs Act — Construction — "Misbranding" — "Adulterated."

The provision of the food and drugs act (Act June 30, 1906, c. 3915, § 8, 34 Stat. 771 [U. S. Comp. St. Supp. 1909, p. 1191]) that a mixture or compound known as an article of food under its own distinctive name and not an imitation sold under the distinctive name of another article, if the name is accompanied by a statement of the place of manufacture, shall not be deemed adulterated or misbranded unless it contains some added poisonous or deleterious ingredient, protects such an article from the charge of misbranding only in so far as any statement or suggestion contained in the name itself is concerned, and does not prevent its condemnation as misbranded, if, in addition to such distinctive name, the label contains other misleading statements, designs, or devices.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 5; Dec. Dig. § 5.*

What constitutes a violation of pure food regulations, see note to Brina v. United States, 105 C. C. A. 559.]

Libel by the United States for condemnation of 40 barrels and 20 kegs of Coca-Cola, the Coca-Cola Company, claimant. On motion by claimant for directed verdict. Sustained in part.

A libel for condemnation was filed in the name of the United States of America by the United States Attorney under section 10 of the Food & Drugs Act of June 30, 1906. c. 3915. 34 Stat. 771 (U. S. Comp. St. Supp. 1909, p. 1193), for the seizure for confiscation of forty barrels and twenty kegs of a food product labeled "Coca-Cola," alleged to be adulterated and misbranded under the said Food & Drugs Act, which the Coca-Cola Company of Atlanta, Georgia, had caused to be transported for sale by an interstate carrier from Atlanta, Georgia, to Chattanooga, Tennessee, consigned to the Coca-Cola Bottling Works, for the use of itself and other persons, and which then remained in the original unbroken packages in Chattanooga, Tennessee. An amended libel was subsequently filed.

The original and amended libels alleged that said food product was adulterated under the Food & Drugs Act in this: (a) That it contained an added ingredient, caffeine, which was a poisonous ingredient and might render said food product injurious to health; (b) that it contained an added ingredient, caffeine, which was a deleterious ingredient and might render said food product injurious to health; and (c) that said food product had been mixed, colored, coated or stained by the use of caramel and other coloring and flavoring substances, whereby damage or inferiority of said food product was concealed.

The libels further alleged that said food product was misbranded under the Food & Drugs Act in this: (1) that the label on each package contained the statement "Delicious and Refreshing Coca-Cola," the expression "Coca-Cola" thus employed being a representation of the presence in said food product of the substances coca and cola, substances known under their own distinctive names; whereas said food product contained no coca and little, if any, cola, and said food product was therefore an imitation of the articles or substances coca and cola, and offered for sale under the distinctive names of said two substances, and said statement was a false and misleading statement regarding the ingredients and substances contained in said food product; and (2) that the label on each package also had a pictorial design of coca leaves and cola nuts, being a suggestion and representation of the presence in said food product of both coca, the leaves of the coca plant, and cola, the nut or fruit of the cola plant, when in truth said food product did not contain any coca, and little, if any, cola, in its composition, and said pictorial design was thus a false and misleading design regarding the ingredients and substances contained in said product.

After seizure of the food product the Coca-Cola Company intervened as its claimant and filed answers to the original and amended libels in which it admitted the shipment and labeling of the food product Coca-Cola as alleged.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep r Indexes

It further admitted that one of the ingredients contained in said Coca-Cola was a small proportion of caffeine, but denied that as contained in said product it was a deleterious ingredient or rendered the product injurious to health, and further denied that it was an "added ingredient"; and averred that said Coca-Cola was a mixture or compound of which caffeine was an essential constituent, whose presence did not constitute an adulteration under the Food & Drugs Act. It further admitted that said product did not contain the chief active principle of coca leaves, but denied that the name was intended to indicate that it did contain said principle, and denied that the name Coca-Cola was a representation of the presence of the substances coca and cola, or that there were substances known as coca and cola, but averred that it did contain certain elements or substances derived from coca leaves and cola nuts, and that no valuable constituent under the formula of Cola-Cola had been abstracted from the compound. It further averred that the name Coca-Cola as contained on the labels was a reproduction or facsimile of the registered trade-mark under which said product had been made and sold for more than twenty years; that said product was a mixture or compound which had been widely and generally known under the aforesaid name, which was its own distinctive name, and an arbitrary and fanciful name clearly distinguishing it from any other food product, mixture or compound; and that the name was accompanied on the labels with a statement of the places where it was manufactured or produced; that it did not contain any added poisonous or deleterious ingredient, and was not an imitation of or offered for sale under the distinctive name of any other article. All other allegations as to the alleged adulteration or misbranding of the food product were denied.

The claimant having demanded a trial by jury of the issues of fact joined in the case, a trial was had before the court and jury. At the conclusion of all the evidence the claimant moved the court for peremptory instructions to the jury to return a verdict in its favor.

Pritchard & Sizer, Williams & Lancaster, Brown & Spurlock, Candler, Thomson & Hirsch, and R. B. Cooke, for the motion.

J. B. Cox, U. S. Atty., and W. B. Miller, Sp. Asst. Atty. Gen., opposed.

SANFORD, District Judge. 1. The chief question in this case arises under the allegations of the Government's libel that the food product Coca-Cola, which it seeks to condemn, is adulterated in that it contains "an added ingredient, caffeine," which is alleged to be a poisonous and deleterious ingredient that may render such food product injurious to health.

[1] Assuming, for the purpose of determining this motion, that if the caffeine, which is admittedly contained in the Coca-Cola in the proportion of about one and one-fifth grains to each fluid ounce of the syrup, is an "added" ingredient within the meaning of the Food & Drugs Act, there is such conflict in the evidence as to whether it is a deleterious ingredient which may cause injury to the health, that the question of its qualities and effect should be submitted to the jury for determination, as a question of fact and not of law, the preliminary question arises, whether, upon the undisputed evidence in this case, it can be deemed an "added" ingredient to the Coca-Cola within the meaning of the Food & Drugs Act, so that its presence can in any event cause an adulteration of that article within the meaning of the Act.

The material provisions of the Act, in so far as they bear upon this question, are as follows:

By section 6 it is provided that the term "food," as used therein, shall include all articles used for food, drink, confectionery or con-

diment by man or other animals, whether simple, mixed or compound.

By section 7 it is provided that confectionery shall be deemed to be adulterated if it contain any "mineral substance or poisonous color or flavor, or other ingredient deleterious or detrimental to health"; and that an article of food shall be deemed to be adulterated "if it contain any added poisonous or other added deleterious ingredient which may render such article injurious to health."

By section 8 it is provided that an article of food shall be deemed to be misbranded "if the package containing it or its label shall bear any statement, design or device regarding the ingredients or the substances contained therein, which statement, design or device shall be false or misleading in any particular; Provided, That an article of food which does not·contain any added poisonous or· deleterious ingredients shall not be deemed to be adulterated or misbranded in the following cases: First. In the case of mixtures or compounds which may be now or from time to time hereafter known as articles of food, under their own distinctive names, and not an imitation of or offered for sale under the distinctive name of another article, if the name be accompanied on the same label or brand with a statement of the place where said article has been manufactured or produced"; and "provided further, that nothing in this Act shall be construed as requiring or compelling proprietors or manufacturers of proprietary foods which contain no unwholesome added ingredient to disclose their trade formulas, except in so far as the provisions of this Act may require to secure freedom from adulteration or misbranding."

And by section 11 it is provided that if it shall appear to the Secretary of Agriculture upon examination of samples, "that any article of food or drug offered to be imported into the United States is adulterated or misbranded within the meaning of this Act, or is otherwise dangerous to the health of the people of the United States" such article shall be refused admission.

In determining the meaning and effect of these provisions of the Act, I have been greatly aided by the argument of counsel for both parties, who have clearly and forcibly stated their respective contentions, and who have conducted the case throughout with signal ability, learning and effectiveness.

Comparing then these several provisions of the Act, so as to give each its reasonable and just meaning, consistently with each other and in accordance with the general purpose of the Act, I am constrained to conclude that the use of the word "added" as applied to poisonous and deleterious ingredients in articles of food other than confectionery, in sections 7 and 8 of the Act, cannot be regarded as meaningless; and that, by contrast with the provision in section 8 that confectionery, which is usually a artificial compound, shall be deemed to be adulterated if it contain any "ingredient deleterious or detrimental to health," and with the provision in section 11 that admission may be refused to any food or drug offered to be imported into the United States if it be adulterated or misbranded within the meaning of the Act or "otherwise dangerous to the health of the people of the United States," it was intended to provide by sections 7 and 8 that any ar·ticles of food manufactured and sold in this country in interstate com-

merce should not be deemed to be adulterated merely because it contained a poisonous or deleterious ingredient, except in the case of confectionery, but that all other articles of food whether simple or compound, were not to be deemed adulterated on account of the presence of a poisonous or deleterious ingredient unless such ingredient was "added" to the article of food in question, that is, was an ingredient foreign to its natural or normal constituency; and that this distinction applies, by the specific provisions of section 8, to compound articles of food known under their own distinctive names, not an imitation or offered for sale under the distinctive name of any other article, and properly labeled as to the place of manufacture.    Thus a natural article of food, for example, coffee, cannot be deemed adulterated, even although the average cup contains a larger amount of caffeine than an ordinary drink of Coca-Cola, and even if caffeine may properly be regarded as a deleterious ingredient injurious to health, since such caffeine is clearly not an added ingredient to the coffee, foreign to its composition, but is one of the essential ingredients naturally and normally entering into its composition.    So an article of food which is not sold under a distinctive trade name but under a well recognized name that has acquired a distinct meaning in general popular usage, as for example, sausage, cannot be deemed adulterated within the meaning of the Act, however deleterious to health some of its normal ingredients may be, provided that as manufactured and sold it does not contain any other poisonous or deleterious ingredients, added to its normal and customary constituents.    And so, likewise, I think it is clear from the provisions of the Act that a compound article of food which is manufactured and sold under its own distinctive name and properly labeled, with whose qualities and effect the public has become familiar, and for which they see fit to buy it, is not to be deemed adulterated within the meaning of the act, provided that when manufactured and sold under this distinctive name it contains no poisonous or deleterious ingredients in addition to its normal and customary constituents, as it has been habitually and regularly manufactured and sold to the public under such distinctive name; although, of course, if it were attempted to add to an article of food thus sold under its distinctive name another ingredient which it had not regularly and habitually contained under the distinctive name under which it had been sold to the public, and such added ingredient were poisonous or deleterious it would thereby become subject to condemnation under the provisions of the Act.

To hold otherwise would, in my opinion, render the word "added" as repeatedly used in the Act in connection with poisonous and deleterious ingredients, entirely meaningless, and would involve an irreconcilable contradiction in the clauses of the Act in which it is expressly provided that a mixture or compound known as an article of food under its own distinctive name, not an imitation of or offered for sale under the distinctive name of another article of food, and not containing any "added" poisonous or deleterious ingredient, shall not be deemed to be adulterated.  The conclusion is, to my mind, unavoidable, that by the use of this language Congress intended to provide

that a compound article of food thus known, labeled and sold under its own distinctive name, should be assimilated to a natural product and not be deemed to be adulterated, whatever the character of its ingredients, if it contained no ingredients other than those habitually and regularly entering into it as constituents under the form and with the characteristics with which it had acquired its distinctive name and become known to the public. In this case, as in the case of a natural food product, if the article is sold under the same distinctive name, with the same constituents and with the addition of no other ingredients whatever, the public in purchasing the article is not deceived— as it would be if an essential constituent ingredient were left out— but on the contrary obtains exactly the article which it has been accustomed to buy under this distinctive name, and which possesses exactly the qualities and produces exactly the effect which renders it in the mind of the public a desirable article of consumption, without addition, change or adulteration. And while it is true that a purchaser of Coca-Cola, for example, may not know either that it contains caffeine at all or the actual quantity of caffeine that it contains, the same thing may be true of the purchaser of coffee, or of other natural foods containing poisonous or deleterious ingredients. However, in the one case, as in the other, the purchaser obtains the article which he desires in its entire makeup and composition, without addition or subtraction, and without the addition of any deleterious ingredient with whose effect he is unaccustomed and which he does not desire. In short, in the one case, as in the other, the public obtains without deception exactly the article which it wishes to buy, producing the effect which it desires; and in the one case, as well as in the other, I think the article cannot be properly said to be adulterated within the meaning of the Food & Drugs Act, and the plainly expressed intention of Congress on this subject.

To hold otherwise, in my opinion, would be beyond the province of the court and an attempt to reach by judicial construction a supposed evil in the composition of articles of food sold under their distinctive names, which, if a remedy be required, can only properly be obtained by legislation. It is well settled that the function of the court in the enforcement of a statute is limited to the ascertainment of the legislative intent as expressed in the Act, and cannot extend to either legislation or amendment; and that considerations of apparent hardship will not justify a strained interpretation of the law as written. The question therefore as to whether the act as drawn is lacking in essential provisions for the protection of the public health in failing to provide that other articles of food, as well as confectionery, shall be deemed adulterated if they contain any ingredient deleterious or detrimental to health, is clearly a legislative question which it is not within the province of the court to determine.

[2] Applying the Act as thus construed to the undisputed facts in evidence, I find the facts established, without any contradictory evidence, to be: That the name "Coca-Cola" is a trade name which has for many years been given by the manufacturer to the food product in question, and upon which name a trade-mark was many years

ago obtained; that this food product is an artificial compound used in the preparation of beverages, consisting of a sweet syrup, colored with caramel, with some phosphoric acid, lemon juice and other minor ingredients, with perhaps some ingredients or qualities derived from the coca leaves and cola nuts which are used to a certain extent in its preparation, after being subjected to a process by which the cocaine and certain other ingredients are extracted, and also containing as an essential ingredient of the compound, caffeine, obtained in the main by chemical extraction from theine; that this compound has been for many years manufactured under a formula prescribing certain definite proportions of such caffeine as one of its essential ingredients; that for many years as so manufactured and sold it has regularly and habitually contained the same approximate amount of caffeine, being about one and one-fifth grains to each fluid ounce of the syrup, although slightly less caffeine is contained in the syrup prepared for use in bottles than in that prepared for use at soda fountains, and although the percentage of caffeine in each individual container may vary slightly owing to process of manufacture employed, the average caffeine content being, however, substantially as above stated; that for many years this compound containing such caffeine has been sold under this trade mark name of "Coca-Cola," has been extensively advertised under this name, and has under this name become generally known to the trade and to consumers in the United States; that no other article of food or beverage has been either manufactured or sold under the name of "Coca-Cola"; that it imitates no other article and is not sold under the distinctive name of any other article and that this name distinguishes this particular product from all other beverages and articles and clearly identifies it as a particular kind and brand of beverage made by its manufacturer and sold under this name, and distinguishes it from all other beverages or food products manufactured and sold by other persons.

I therefore find, as a conclusion of law, from these facts, that the name "Coca-Cola" is and was at the time this libel was filed a distinctive name which clearly distinguishes this particular compound from any other food product; and I further find from the undisputed facts in evidence that the "Coca-Cola" sought to be condemned in this case is and was when the libel was filed a compound known as an article of food under its own distinctive name; that it is and was not an imitation of or offered for sale under the distinctive name of any other article; that the name on the label is and was accompanied with a statement of the places where the article was manufactured; and that the caffeine which it contained is and was not an "added" ingredient within the meaning of the Food and Drugs Act, but is and was a usual and normal constituent of the article that had been and was known to the public under the distinctive name of "Coca-Cola." And I therefore conclude that as a matter of law the Coca-Cola in question is not to be deemed as adulterated by the presence of caffeine as an "added" ingredient within the true intent and meaning of the Act.

The conclusion thus reached is strengthened by a consideration of the pleadings in this case. In the libel it is alleged that the food product

"Coca-Cola" which it was sought to condemn is adulterated in that it contained an "added" ingredient caffeine, which was and is both poisonous and deleterious. Yet the entire proof unquestionably shows that the caffeine contained in the article "Coca-Cola" is one of its regular, habitual and essential constituents, and that without its presence, that is, if it were de-caffeinized, so to speak, the product would lack one of its essential elements and fail to produce upon the consumers a characteristic if not the most characteristic effect which is obtained from its use. In short Coca-Cola without caffeine would not be Coca-Cola as it is known to the public and would not produce the effect which the Coca-Cola bought by the public under that name produces, and if it were sold as "Coca-Cola" without containing caffeine the public buying it under this name would be in fact deceived.

The Government's contention then, under the proof, leads to this— there being, it is to be observed, no issue raised in the pleadings as to the amount of the caffeine contained—that an entire compound containing a certain ingredient, which is one of its essential ingredients, and without which the compound would lose its characteristic qualities, is, as an entire compound, to be deemed adulterated because it contains such ingredient, on the theory that such ingredient is added to the compound, as distinguished from being contained in it as an essential constituent of the entire compound. It is difficult to see, however, how any part which is an essential of an entire article, and without which the entire article would not exist, can be properly deemed to be added to the entire article, or in short, to be added to or adulterate itself.

The case would be different, of course, if the libel alleged that any other constituent element of the compound as for example the syrup, was sold as syrup, and in fact adulterated with caffeine. That, however, is not this case. The libel specifically alleges that the food product "Coca-Cola" is adulterated by the addition of caffeine, and the proof unquestionably shows that the caffeine is not an addition to this compound, but is one of its essential and normal ingredients under the distinctive name under which it has been sold and is known to the public.

It results that in so far as the libel charges that Coca-Cola is adulterated because it contains caffeine as an added ingredient the claimant's motion for peremptory instructions must be sustained.

[3] 2. It is also alleged in the libel that the name "Coca-Cola" as used on the label suggests and represents the presence in this food product of coca, meaning the leaves of the coca plant, and that this product does not in fact contain any coca in its composition, thereby constituting a false and misleading statement regarding the ingredients and substances contained in the "Coca-Cola." Assuming, for the purposes of determining this motion that there may be a disputed question of fact as to whether the use of the word "coca" in the name contained upon the label is to be regarded intrinsically and originally as a statement or suggestion of the presence in the product of the leaves of the coca plant or of some material element or quality derived therefrom, and further assuming that there may be a conflict in the evi-

dence as to whether or not there is contained in "Coca-Cola" any portion of the leaves of the coca plant or any substance or quality derived therefrom to any material degree, the preliminary question arises as to whether, upon the other undisputed facts in evidence, these issues of fact shall be submitted to the jury for their determination, as questions of fact, or whether under the other undisputed evidence in the case, these allegations, if true, are, as a matter of law, immaterial.

Without stating my reasons in detail it is sufficient at this time to say that after careful consideration of the question I have, for reasons directly analogous to those which determined my conclusions in reference to the adulteration of an article sold under the distinctive name, concluded that it was the intention of Congress to provide that where a compound article of food was known under its own distinctive name, was not an imitation of any other article of food or sold under the distinctive name of any other article, was properly labeled as to the place of manufacture, and contained no "added" poisonous or deleterious ingredient, it should not be deemed misbranded within the meaning of the Food & Drugs Act in so far as any statement or suggestion contained in the name itself is concerned. To hold otherwise would, in my opinion, involve an absolute and irreconcilable contradiction between the several clauses in section 8 of the Act, and would render meaningless the express provision of that section that a compound known as an article of food under its own distinctive name, not an imitation of or offered for sale under the distinctive name of another article, properly labeled with the place of manufacture, and not containing any added poisonous or deleterious ingredients, shall not be deemed to be misbranded. Obviously if the article contains the same constituents as those normally and regularly contained under the distinctive name under which it is sold and under which it is known to the public, the distinctive name indicating this distinctive article, is not misleading, but on the contrary serves to directly inform the public that it is the specific article which the public knows under that name and desires to buy.

It results from the fact hereinbefore found from the undisputed evidence that in so far as the libel charges the misbranding of the Coca-Cola by reason of any false statement or suggestion contained in the name itself, the claimant's motion for peremptory instructions must be sustained.

3. It also results from what has been heretofore stated, that in so far as the libel charges that the Coca-Cola is misbranded because of being an imitation of or offered for sale under the distinctive name of another article, in the entire absence of evidence to show that this is the case, the claimant's motion for peremptory instructions in so far as this charge of the libel is concerned must also be sustained.

4. With reference to the charge that the Coca-Cola was misbranded by reason of being mixed, colored or stained by the use of coloring substance whereby damage or inferiority of the mixture was concealed, without expressing any opinion upon the weight of the evidence, I am of the opinion that the evidence is not so undisputed as to constitute

the solution of this question a mere matter of law, but that this question should be left to the jury under the issues raised by the pleadings.

[4] So far, therefore, as this charge in the libel is concerned claimant's motion must be overruled.

5. As to the charge in the libel that the pictorial design of coca leaves on the labels is misleading in that it represents and suggests the presence of the substance coca in the "Coca-Cola" product I have had great difficulty. While it is apparently true that under the provision of the Act heretofore quoted that no compound food product sold under its own distinctive name shall be deemed to be misbranded, when it contains no added poisonous or deleterious ingredient and is otherwise sold and labeled in accordance with the Act, it would apparently follow, as a matter of the strict letter of the law, that in the absence of any added poisonous or deleterious ingredient, a product thus sold under its distinctive name cannot be deemed misbranded upon any ground. I have concluded however, that giving a fair and reasonable construction to the somewhat conflicting provisions of the Act, it was only intended to protect an article sold under its distinctive name from the charge of misbranding in so far as any statement or suggestion contained in the name itself is concerned, and that it was not intended to prevent the condemnation of the article as misbranded, even though sold under its own distinctive name, if in addition to such distinctive name the label contains other misleading statements, designs or devices. Without expressing any opinion as to whether the pictorial design on the label in question is misleading in any particular as to the presence of coca leaves or any ingredient or quality derived therefrom, I am of the opinion that under the evidence in the case this is not purely a question of law, but is a question of fact, which, under all the evidence should be submitted to the jury for its determination. Therefore in so far as the charge of misbranding based upon the pictorial design of coca leaves upon the label is concerned, the claimant's motion for peremptory instructions will be overruled.

To the extent hereinabove stated the claimant's motion for peremptory instructions is accordingly sustained; otherwise it is overruled.

---

Thereupon the Government in open court dismissed so much of the libels as charged the misbranding of the Coca-Cola by reason of being an imitation of or offered for sale under the distinctive name of another article, or by reason of being mixed, colored, or stained by the use of coloring substance, whereby damage or inferiority of the mixture was concealed. The court thereupon gave the jury peremptory instructions to return a verdict on the remaining issues in favor of the claimant, which was done, and judgment thereupon entered on this verdict dismissing the libels.